**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 17-cr-00827 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| BRYAN PROTHO | ) | |
| | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

On December 20, 2017, Minor A[1] was kidnapped while walking home from school in Calumet City, Illinois. The perpetrator dragged her into his car, drove her into a back alley, sexually assaulted her, let her out of the vehicle, and drove off. Defendant Bryan Protho was subsequently arrested for the crime, tried before a jury, and convicted of one count of kidnapping in violation of the Federal Kidnapping Act, 18 U.S.C. § 1201(a)(1). Because the jury also found that Minor A was under 18 years old, Protho was over 18 years old, and Protho was not related to Minor A, Protho is subject to an enhanced penalty—specifically, a mandatory minimum sentence of 20 years' imprisonment—pursuant to 18 U.S.C. § 1201(g)(1). Protho has now filed post-trial motions for judgment of acquittal and for a new trial pursuant to Federal Rules of Criminal Procedure 29 and 33, respectively. (Dkt. Nos. 150, 152.) For the following reasons, the Court denies Protho's motions.

## BACKGROUND

Protho was convicted of kidnapping Minor A after a two-week trial, during which the jury heard testimony from 30 witnesses and saw more than 100 exhibits admitted into evidence. The following summarizes the trial evidence.

---

[1] The victim is referred to as "Minor A" throughout this opinion.

The victim, Minor A, testified regarding her kidnapping and assault.[2] (Tr. 1004–63.) She stated that on December 20, 2017, a person in a red truck started following her as she was walking home from school. (Tr. 1010–12.) The driver pulled into a driveway, got out of the car, pretended to be talking on the phone, and then grabbed Minor A and pulled her into the car. (Tr. 1012–13.) The driver hit her, threatened her, and drove into an alley. (Tr. 1014–18.) He sexually assaulted Minor A and then let her out of the car. (Tr. 1018–23.) Minor A ran down the alley and started knocking on doors to get help, ultimately flagging down a woman who assisted her. (Tr. 1023.) The woman who stopped to assist Minor A after she escaped from her attacker also testified to the jury regarding her interactions with Minor A following these events. (Tr. 618–39.)

At trial, Minor A described for the jury her assailant's race, facial features, bald head, and clothing, including a purple hat. (Tr. 1026.) Minor A also testified about how she had identified her assailant in a photo array seven days after her assault and again when shown photographs a few weeks later. (Tr. 1026–29.) Law enforcement officers testified that the images Minor A identified depicted Protho, and those images were admitted into evidence. (Tr. 696–97, 701, 934–95, 1029.) According to these witnesses, Minor A initially described her attacker as a heavy-set African-American male, with little moles near his eye and a short beard, wearing a black jacket and dark pants, and driving a red SUV. In a later interview, she added that he also wearing the aforementioned purple hat and had a scar on his cheek.

That Minor A was grabbed off the street by a male attacker in the manner she described was not seriously disputed at trial, as the abduction was captured on video by a security camera at a nearby residence, the video was played for the jury, and a witness was called to authenticate

---

[2] As discussed in greater detail below, Minor A testified via closed-circuit television pursuant to 18 U.S.C. § 3509.

the footage. (Tr. 592–600.) However, the images of Minor A's attacker on the video were not sufficiently clear to permit ready identification. Thus, the Government's case-in-chief focused on proving that Protho was the perpetrator.

The Government called several witnesses to present evidence placing Protho and his vehicle in the vicinity of the kidnapping on December 20, 2017. Even putting aside Minor A's identification of him from the photo array and photographs, the Government presented ample evidence that the vehicle used in the kidnapping was Protho's red Ford Explorer, that Protho himself was present with his Ford Explorer at a gas station in Calumet City less than two miles from where the kidnapping occurred and less than half and hour before the kidnapping occurred, and that later on the day of the kidnapping, Protho went to a hospital wearing clothes (a black hooded sweatshirt, white t-shirt, dark pants, and hat) similar to the clothing worn by the kidnapper. For example, Robert Strobo, the general counsel for Paysign, a company that issues prepaid credit cards, testified regarding records showing where and when a prepaid card issued to Protho was used on the day of the crime. (Tr. 756–64.) Rod Smith, an employee at the Illinois Secretary of State's Department of Information Technology, testified regarding temporary license plate records related to Protho's vehicle. (Tr. 765–73.) Debbie Swanson, the director of health information management at St. Catherine Hospital, testified about medical records showing that Protho checked into the hospital on the day of the kidnapping after the kidnapping occurred. (Tr. 860–64.) Protho was also recorded by the hospital video cameras while he was there. Matthew Fyie, a manager of design analysis engineering at Ford Motor Company, testified that certain features on Protho's car (including nonstandard wheels and a missing passenger-side step-up bar) that could be seen on the vehicle in the surveillance video of the kidnapping, represented custom modifications (*i.e.*, not standard features) for a Ford Explorer. (Tr. 864–91.)

Lorena Martinez, a supervisor at the staffing agency where Protho worked, testified that he was not at work on the day of the kidnapping or the following day. (Tr. 1149–60.)

In addition, the Government called as witnesses five Calumet City Police Department employees, who testified regarding the investigation of the kidnapping and the evidence collected. (Tr. 640–701, 734–55, 891–97.) Craig Golucki, a Chicago Police Department officer, testified that he extracted data from Protho's phone and indexed its contents following his arrest. (Tr. 1194–1208.) Several Federal Bureau of Investigation ("FBI") agents and task force officers also testified regarding the investigation, including their interviews with Minor A, her identification of Protho as the assailant, and other details. (Tr. 773–812, 931–49, 1216–97, 1513–22.) The investigation included the collection of surveillance video from various sources in the community, including red-light camera and security video showing the path driven by the vehicle involved in the kidnapping and providing a clear image of the vehicle's yellow temporary license plate as well as other identifying characteristics.

Other FBI employees provided expert testimony. Ashley Baloga, an FBI forensic examiner, testified that certain fibers found on Minor A's clothing were consistent with fibers found on Protho's clothing and vice versa. (Tr. 897–926, 949–60.) Anthony Imel, another FBI forensic examiner, explained how the jury could use matching "class characteristics" to compare photographs of Protho and his Ford Explorer with images from video footage from the day of the kidnapping of the attacker and his vehicle. (Tr. 1305–1402, 1429–53.) Joseph Raschke, an FBI special agent with expertise in cellular analysis, testified that "cell-site information" showed that Protho's phone was off or unable to connect to service between 12:52 p.m. and 3:45 p.m. on December 20, 2017, a period of time that overlapped with the time of the kidnapping. (Tr. 1114–48.)

4

After the Government rested its case-in-chief, Protho testified in his own defense. His testimony focused on what he claims to have been doing at the time of Minor A's kidnapping, including suggesting an explanation for how his car could have been present at the crime scene even though he was not there. Specifically, Protho testified that he had lent his car to his friend "Ell" during the time when the kidnapping occurred. (Tr. 1549–51.) Protho explained that Ell was his marijuana dealer and that he did not know "Ell's" last name, although he had known Ell for 15 years. (Tr. 1536–37.) Protho also stated that Ell had arranged to meet Protho at a parking lot to deliver marijuana to him (for which Protho had already paid), that Ell then told Protho that he did not have the drugs with him and wanted to borrow Protho's car to pick them up, and that Protho loaned Ell his car for that purpose. (Tr. 1543–50.) Protho explained that he fought with Ell physically, injuring one of his own fingers. (Tr. 1549.) Protho claims that he initially waited in Ell's car while Ell went to pick up the drugs, but ultimately he decided to drive home in Ell's car after Ell failed to return. (Tr. 1555–57.) According to Protho, Ell later drove to Protho's home (again without bringing any marijuana), the two men got into a "scuffle," and Ell left. (Tr. 1557–58.) Protho also described Ell's physical appearance, which happened to be consistent with the description of her attacker given by Minor A. (Tr. 1552–54.) Furthermore during his cross-examination by the Government, Protho attempted to explain why he did not provide the story regarding Ell to law enforcement officers investigating the kidnapping at any time from his initial interview up until he took the stand at trial. Specifically, Protho testified that when he was first interviewed about the crime, he was worried that the officers might be lying to him about their investigation of a sexual assault to get him to admit something about his drug transactions. (Tr. 1796–97.)

In further support of his claim that someone else must have kidnapped and assaulted Minor A, Protho also called to the witness stand several police officers, who testified regarding certain purported inconsistencies in Minor A's statements describing her attacker, including that she at times described the kidnapper's hat as black, not purple or maroon. (Tr. 1481–1522.)

The Government presented two rebuttal witnesses. First, Breanna Barajas, a program supervisor and forensic interviewer at La Rabida Children's Advocacy Center who interviewed Minor A the day after she was assaulted, testified that the victim described the kidnapper's hat as purple during their interview. (Tr. 1809–13.) Second, the Government recalled Golucki, who testified that a photograph on Protho's phone appeared to have been deleted—the inference being that Protho deleted it to hide his involvement in the crime. (Tr. 1814–22.)

## LEGAL STANDARDS

Protho has filed post-trial motions under Federal Rules of Criminal Procedure 29 and 33. Rule 29 requires the Court to enter a judgment of acquittal where the evidence presented at trial "is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "[A] defendant seeking a judgment of acquittal faces a nearly insurmountable hurdle . . . [but] the height of the hurdle depends directly on the strength of the government's evidence." *United States v. Garcia*, 919 F.3d 489, 496–97 (7th Cir. 2019) (internal quotation marks omitted). Great deference is given to the jury's determination: "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, ***any*** rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). While this analysis requires that evidence be viewed in the light most favorable to the Government, Protho need not establish that no evidence supports his convictions. *Id.* at 320.

Instead, "[a] properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt." *Id.* at 317.

Protho also seeks a new trial under Rule 33, pursuant to which "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. The Seventh Circuit has cautioned that Rule 33 motions should be granted only in "the most extreme cases." *United States v. Linwood*, 142 F.3d 418, 422 (7th Cir. 1998) (internal quotation marks omitted); *see also United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994) (explaining that jury verdicts in criminal cases are "not to be overturned lightly"). "A new trial is warranted only where the evidence preponderates so heavily against the defendant that it would be a manifest injustice to let the guilty verdict stand." *United States v. Conley*, 875 F.3d 391, 399 (7th Cir. 2017). Accordingly, "[t]he court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable . . . The evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *United States v. Reed*, 875 F.2d 107, 113 (7th Cir. 1989) (internal quotation marks omitted).

## DISCUSSION

### I.      Acquittal Based on the Sufficiency of the Evidence

In his Rule 29 motion, Protho argues that he is entitled to a judgment of acquittal based on the purportedly insufficient evidence supporting the jury's guilty verdict. When evaluating a challenge to a guilty verdict based on the sufficiency of the evidence, the Court must "view the evidence in the light most favorable to the prosecution and ask whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Salinas*, 763 F.3d 869, 877 (7th Cir. 2014) (citing *Jackson*, 443 U.S. at 319). To overturn a

jury verdict, the Court must conclude that "the record is devoid of the evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Mire*, 725 F.3d 665, 678 (7th Cir. 2013).

Protho contends that no reasonable jury could have credited the eyewitness identification by Minor A because her description and recollection of the kidnapper differed from Protho's actual appearance. Specifically, among other things, Minor A did not initially describe the kidnapper as having a beard, did not mention certain marks on Protho's face (including his tattoos), and stated that the kidnapper had a pattern of what appeared to be little moles all around his face. Protho further notes that his DNA was not found on the victim or her clothes to a reasonable degree of scientific certainty, and no fingerprint or DNA evidence linked him to the offense. Finally, Protho points out that no one other than Minor A identified him as the kidnapper.

Contrary to Protho's assertions, however, the jury in this case saw and heard plenty of evidence pointing to his guilt. First, the jury learned that Minor A identified Protho in a six-person photo array seven days after the kidnapping. A few weeks later, she viewed additional images (which were admitted into evidence at trial) and told law enforcement that she was 100 percent certain that the person pictured was the man who kidnapped her. (Tr. 1030.) The jury heard Minor A's testimony, including the cross-examination by Protho's counsel, and was able to assess her credibility and the reliability of her memory.

The jury also heard evidence indicating that Protho's car was used in the kidnapping and suggesting that he was in the vicinity as well. The jury viewed numerous surveillance videos that captured the kidnapping as well as events leading up to and following the crime. Credit card records placed Protho within around two miles from the scene of the kidnapping 22 minutes

8

before it occurred. (Tr. 1918–19.) Cell-site and telephone records showed that Protho's phone had no activity during and around the time of the kidnapping. (Tr. 1156.) Employment records and testimony from Protho's supervisor confirmed that Protho did not attend work, yet did not call off of work on the day of the kidnapping. (Tr. 1156–60.)

The testimony from the Government's fibers expert provided a basis for the jury to conclude that fibers were transferred between Protho's clothing and Minor A's clothing. (Tr. 897–926, 949–60.) Video of Protho at a hospital showed that, on the evening of the kidnapping, he was wearing clothing that matched the victim's description of the kidnapper, including a purple hat. (Tr. 696–701.) And finally, a reasonable jury could have discounted Protho's testimony suggesting that the real kidnapper was his marijuana dealer, who looked similar to Protho, wore similar clothing to him, and had borrowed Protho's car to pick up drugs. The jury had the opportunity to assess Protho's own credibility and could have reasonably determined that he was not telling the truth.

Simply put, there was ample evidence to support the jury's guilty verdict. In asking the Court to conclude otherwise, Protho beseeches the Court to draw inferences in his favor and to find that his attempts to impeach the Government's case were so successful that no reasonable jury could have found him guilty. But the Court, as it must, draws all reasonable inferences in the Government's favor. Based on the record, a reasonable jury easily could have found against Protho on all elements of the charged crime.

## II. Acquittal or New Trial Based on the Constitutionality of the Federal Kidnapping Act

Protho also has renewed post-trial his argument that the Federal Kidnapping Act unconstitutionally exceeds Congress's authority under the Commerce Clause. He challenges the statute as unconstitutional on its face and as applied to the circumstances of this case. Protho

further contends that even if the statute is constitutional, his Ford Explorer does not constitute an instrumentality of interstate commerce and the jury instruction permitting the jury to reach that conclusion was given in error.

The Federal Kidnapping Act makes it a federal crime to seize, confine, or kidnap any person for ransom, reward, or "otherwise," when the perpetrator, as relevant here, "uses the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense." 18 U.S.C. § 1201(a). Pursuant to the Commerce Clause, Congress has the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. 1, § 8, cl. 3. This power includes the ability to "regulate the use of the channels of interstate commerce . . . regulate and protect the instrumentalities of interstate commerce . . . [and] regulate those activities having a substantial relation to interstate commerce." *United States v. Lopez*, 514 U.S. 549, 558–59 (1995). Nonetheless, the Commerce Clause does not grant Congress unlimited authority to regulate or criminalize behavior carrying any link whatsoever to interstate commerce. *See United States v. Morrison*, 529 U.S. 598 (2000) (holding that Congress could not provide a civil remedy for victims of domestic violence under the Commerce Clause); *Lopez*, 514 U.S. 549 (finding that the Gun-Free School Zones Act, which criminalized the possession of firearms within a certain distance of schools, was not within the scope of Congress's power under the Commerce Clause).

The scope of the Federal Kidnapping Act, however, is specifically limited to kidnappings involving the mail or means, facilities, or instrumentalities of interstate or foreign commerce. By its terms, the statute does not extend beyond the limits of the Commerce Clause. Numerous appellate and district courts have upheld the constitutionality of the statute, while the Court has found no caselaw finding it unconstitutional. *See United States v. Chambers*, 681 F. App'x 72,

81–82 (2d Cir. 2017) (unpublished), *cert. granted, judgment vacated on other grounds*, 138 S. Ct. 2705 (2018) (denying facial and as-applied challenges to the Act); *United States v. Morgan*, 748 F.3d 1024, 1031–32 (10th Cir. 2014) (rejecting as-applied challenge to the Act); *United States v. Davis*, No. 16 CR 570, 2019 WL 447249, at *2 (N.D. Ill. Feb. 5, 2019) (collecting cases). The Federal Kidnapping Act fits the second category of permissible regulation under the Commerce Clause, "which includes regulation aimed at local, in-state activity involving instrumentalities of commerce." *Morgan*, 748 F.3d at 1031.[3] The Court therefore rejects Protho's facial challenge to the act's constitutionality.

With respect to the application of the kidnapping statute in this case, Protho argues that a local, intrastate action cannot be criminalized merely because the vehicle used to commit it was manufactured in another state. But the Government here contends that Protho's car is an instrumentality of interstate commerce, not because of the location of its manufacture or its manner of use, but rather because it can carry people and goods across state lines. *See United States v. Richeson*, 338 F.3d 653, 660–61 (7th Cir. 2003) ("[F]ederal jurisdiction is supplied by the nature of the instrumentality or facility used, not by separate proof of interstate movement." (internal quotation marks omitted)).

The Seventh Circuit has in a similar context—evaluating the constitutionality of the federal murder-for-hire statute—held that a car is an instrumentality of interstate commerce even when used in an intrastate manner. *See United States v. Mandel*, 647 F.3d 710, 722 (7th Cir. 2011) (denying Commerce Clause challenge under plain error standard and noting that

---

[3] Protho contended in his initial motion for acquittal (Dkt. No. 114) that the kidnapping statute can only be sustained under the third category enumerated in *Lopez* concerning "activities having a substantial relation to interstate commerce." 514 U.S. at 558–59. But the act, by its language, targets instrumentalities of interstate commerce specifically and does not criminalize the broader category of ***activities*** relating to interstate commerce; thus, it is more reasonably construed as regulating instrumentalities of interstate commerce, the second *Lopez* category.

automobiles "play a crucial role in interstate commerce"); *see also United States v. Cobb*, 144 F.3d 319, 322 (4th Cir. 1998) (holding that automobiles are instrumentalities of interstate commerce); *United States v. Bishop*, 66 F.3d 569, 588 (3d Cir. 1995) (same). This Court finds the reasoning of *Mandell* persuasive in disposing of Protho's argument that his Ford Explorer was not an instrumentality of interstate commerce. If Protho's vehicle had been gutted of its operating components, or even stripped of its wheels and put up on blocks in his backyard, he might have an argument that it could no longer be used to move goods or people and thus could not form the basis for criminal liability under the federal kidnapping statute. As the record stands, however, there is no reasonable dispute that his vehicle qualifies as an instrumentality of interstate commerce.

Protho relatedly argues that he is entitled to a new trial because the Court erred in instructing the jury that "[t]he defendant used a means, facility, or instrumentality of interstate commerce if he used an automobile in committing or in furtherance of the commission of the offense." (Jury Instructions, Dkt. No. 124 at 25.) But, as discussed above, an automobile is an instrumentality of interstate commerce. The Court has discretion to formulate jury instructions so long as the instructions "represent[] a complete and correct statement of law." *United States v. Matthews*, 505 F.3d 698, 704 (7th Cir. 2007). Here, the Court correctly stated the law in instructing the jury. There was no error and certainly not one warranting a new trial.

### III. New Trial Based on Improperly Admitted Expert Testimony

Prior to trial, the Court denied Protho's motions *in limine* to bar testimony from expert witnesses Ashley Baloga and Matthew Fyie. The Court also denied in part and granted in part Protho's motion to bar testimony from Anthony Imel. Protho contends that the Court erred with

12

its rulings allowing these experts to testify, causing him prejudice and entitling him to a new trial.

Federal Rule of Evidence 702 governs the admissibility of expert evidence. It provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)  the testimony is based on sufficient facts or data;
>
> (c)  the testimony is the product of reliable principles and methods; and
>
> (d)  the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Under this rule, expert testimony must both assist the trier of fact and demonstrate sufficient reliability. *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015). Accordingly, "the district court serves as a 'gatekeeper' whose role is to ensure that an expert's testimony is reliable and relevant." *Stuhlmacher v. Home Depot USA, Inc.*, 774 F.3d 405, 409 (7th Cir. 2014). To be admissible, expert testimony must also reveal something that is not "obvious to the lay person." *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001) (internal quotation marks omitted).

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court laid out four factors that courts may use to evaluate the reliability of expert testimony: (1) whether the expert's conclusions are falsifiable; (2) whether the expert's method has been subject to peer review; (3) whether there is a known error rate associated with the technique; and (4) whether the method is generally accepted in the relevant scientific community. 509 U.S. 579, 593–94

(1993). This list is neither exhaustive nor mandatory and, ultimately, reliability is determined on a case-by-case basis. *Textron, Inc.*, 807 F.3d at 835. And the Court wields substantial discretion in carrying out its gatekeeping function: "The trial court must have the same kind of latitude in deciding **how** to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides **whether or not** that expert's relevant testimony is reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). The proponent of the expert testimony bears the burden of demonstrating that the testimony satisfies the *Daubert* standard. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

### A. Ashley Baloga

Baloga testified at trial as an expert in fiber analysis. With his present motion, Protho does not challenge Baloga's qualifications but instead renews his pretrial argument that fiber analysis is insufficiently reliable to satisfy the *Daubert* standard and that Baloga's testimony was not relevant.

To be relevant, expert testimony must assist the trier of fact. *Textron*, 807 F.3d at 834. The evidence presented by Baloga at trial tended to show that fiber evidence recovered from Protho's car and clothing was consistent with fiber evidence from Minor A's clothing. Baloga's testimony was relevant because it tended to make it more likely that Minor A was in Protho's car and that Protho had physical contact with her. Baloga further testified that, although there was no way one could determine a percentage likelihood of random fibers matching, it was unlikely that the fibers on two random pieces of clothing would show a match.

As the Court noted in its prior ruling, appropriately credentialed fiber analysis experts are regularly qualified as expert witnesses in federal courts. The Court further found that, based on

the parties' representations, the conclusions of fiber analysis are falsifiable and that the methods of fiber analysis are generally accepted in the relevant scientific community. The Court also reviewed Baloga's expert report, which detailed the items that she reviewed, the methodology she employed, and the results of her examinations. Even though the Government did not show that fiber analysis techniques had been subjected to peer review or were subject to a known error rate (indeed, Baloga testified that she could not provide an error rate), the Court was presented with enough indicia of reliability to admit the testimony. Then, at trial, Baloga described her methodology in detail while acknowledging its limitations, allowing the jury to properly weigh her testimony. Protho tested her methodology further through cross-examination. The Court had no obligation to hold a separate *Daubert* hearing to decide whether to admit Baloga's testimony; as discussed above, the Court has discretion to determine how it will evaluate the reliability of a proposed expert. And finally, even if Baloga's testimony was admitted in error (which it was not) the evidence against Protho was strong enough that he would not have been prejudiced by the admission of the testimony, a conclusion that the Court also draws regarding Imel and Fyie.

### B. Anthony Imel

Imel testified as an expert in forensic video and photograph analysis. As with Baloga, Protho does not challenge Imel's qualifications but renews his pre-trial challenge that Imel's testimony did not meet the standards of Federal Rule of Evidence 702 and *Daubert*.[4]

Imel's testimony involved the comparison of images and videos to determine identity—a task that often does not require specialized expertise. Here, however, the Court reviewed Imel's expert report and curriculum vitae and determined that his testimony based on his "knowledge,

---

[4] Protho also contends that Imel was not timely disclosed as an expert witness. But the substance of Imel's testimony was timely disclosed (he stepped in for another FBI employee who would have testified similarly), and the trial date was continued by more than three months after Imel had been disclosed as a witness, meaning that Protho had ample time to prepare.

skill, experience, training or education" would likely "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Imel, an expert in enhancing and comparing photographs and videos, testified regarding how the jury could use distinguishing features to compare enhanced video images of people, as well as how to locate and compare those features in the images and videos available in this case. The central questions for the jury were whether the vehicle depicted in the footage was Protho's car and whether the person shown in security camera footage of the kidnapper was Protho. Imel's testimony added something that was not obvious to the jury: what to look for when comparing enhanced images of persons and vehicles in surveillance footage. Notably, Imel did not opine on whether Protho actually was the kidnapper or whether his car was actually used in the kidnapping. Instead, he merely provided tools for the jury to make those determinations itself.

As noted above, the Court has discretion to determine how best to assess the reliability of proposed expert testimony. Here, the Court considered Imel's unchallenged qualifications as a highly experienced forensic examiner. It also considered his expert report, which explained that certain surveillance videos and images had been electronically processed and enhanced to make it possible to compare the depicted vehicle with Protho's Ford Explorer and the depicted person with Protho himself (who, of course, was present in court as well as presented still images). Imel also described how certain class characteristics—this is, distinguishing marks—could be used to compare images and videos. Based on the record, the Court concludes that Imel's conclusions were falsifiable and his method was generally accepted in the relevant expert community. Specifically, his conclusions regarding matching class characteristics in images could have been rebutted by identifying other class characteristics or reasons other than shared identity to explain shared characteristics. Further, the general acceptance of Imel's method was supported by the

fact that Imel had testified as a forensic video and photography analysis witness around 50 times prior to this trial. The Government did not present evidence of peer review or a known error rate in Imel's method; nevertheless, the Government met its burden of showing that Imel's conclusions were reliable and would be helpful to the jury.

Moreover, Imel's testimony did not improperly usurp the fact-finding role of the jury. In his testimony, Imel explained that he created a composite video by putting side-by-side a video of an individual at a gas station and a video of Protho at the hospital later that day. (Tr. 1398.) The purpose of this video was to portray the gait—that is, the manner in which the persons walked. This comparison video was shown to the jury as a demonstrative exhibit. (Tr. 1722–23.) Imel noted that the person in each of the videos appeared to point his feet outward as he walked. The Government later played a video of Minor A's kidnapping and invited the jury to use the tools described by Imel to determine whether the gait of the person in the kidnapping video matched that of Protho. While Protho contends that Imel's testimony was highly prejudicial and lacked foundation, he was qualified to opine on the class characteristics related to Protho's manner of walking, and he gave no further opinion on whether the gait of the kidnapper actually matched Protho's gait. That was left for the jury to determine. While Protho contends that the danger of prejudice and confusion outweighed the probative value of Imel's testimony, the Court did not find Imel's testimony confusing or misleading and it was appropriately contextualized for the jury's consideration.

Lastly, Protho complains that the Government described Imel's testimony inaccurately in closing arguments. During closing arguments, the Government contended that the victim's identification of Protho was solid, and that her failure to remember every detail about him consistently over the course of multiple interviews was best explained as normal for a young

17

child who had endured a frightening and traumatic experience and due to the fact that she was only with her kidnapper for a short time. As the Government argued:

> [W]hen she's talking to the police, she's crying; she's still afraid. Okay. When that's your opportunity to view [the kidnapper], that's a very particular type of opportunity to view. When that's your opportunity to view, you don't get an exhaustive list of every detail of this person's physical appearance and their clothing. That's not what you get. That's Tony Imel's job.

(Tr. 1903.)

Protho contends that the Government's reference to "Tony Imel's job" improperly suggested that the expert witness, not the jury, was responsible for deciding the identity of the perpetrator. But an equally reasonable characterization Government's argument is simply that a minor victim of kidnapping and sexual assault would not be expected to recall identifying details with the same level of precision as an FBI forensic examiner. The Government's attorney did not state that Imel had identified Protho as the kidnapper, and the closing argument did not imply that the jury had been relieved of its fact-finding responsibility. Furthermore, the Government's stray statement about "Tony Imel's job," even if improper, was harmless in light of the copious evidence of Protho's guilt.

### C.    Matthew Fyie

Fyie, a manager of design analysis engineering at Ford Motor Company, testified that Protho's Ford Explorer was manufactured in Kentucky and had two step-up bars at the time of manufacture. He relied on business records from Ford that were entered into evidence. Protho contends that this testimony should have been excluded because Fyie's testimony was not timely disclosed, he was not an expert in Ford vehicle products, and he had no personal knowledge of where the vehicle was manufactured. Finally, Protho argues that he was prejudiced because the

Government relied on Fyie's testimony to show that the vehicle used in the kidnapping was manufactured in Kentucky to satisfy the interstate commerce element of the criminal charge.

But the jury was properly instructed that the interstate commerce element of the crime with which Protho was charged would be satisfied if Protho used an automobile to commit the offense. The location of the vehicle's manufacture was not the basis for the Government's argument, and Protho could not have been prejudiced by such testimony because it did not impact any element of the offense. Further, Fyie's extensive experience in designing and engineering Ford vehicles qualified him to testify regarding Ford vehicles in general and the manufacture of Protho's vehicle in particular. An experienced Ford engineer could testify regarding on where a vehicle was manufactured by reviewing the business records used to track that information; the rules of evidence do not require that only someone who personally witnessed a truck being built can opine on where it was manufactured.[5] And as the Court previously noted, Fyie's testimony was disclosed to Protho sufficiently in advance of trial for Protho to prepare.

### IV. New Trial Based on *Batson v. Kentucky*

Protho also seeks a new trial based on *Batson v. Kentucky*, 476 U.S. 79 (1986). *Batson* prohibits racial discrimination in jury selection, holding that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Id.* at 89. Protho is black. The venire initially included six black potential jurors. (Tr. 532, 535–36.) After the Court ruled on the parties' challenges for cause,

---

[5] Notably, the business records at issue were admitted pursuant to Federal Rule of Evidence 803(6)(b) and Protho's counsel did not contemporaneously object to their admittance on hearsay grounds (although he did assert a continuing objection as to their relevance.) (Tr. 877.)

only four of the remaining thirty-eight potential jurors were black. The Government used its peremptory strikes to strike three of those four black jurors, including two jurors who would have been on the jury and one who would have been an alternate. Protho also used one peremptory strike on a black potential juror. The resulting jury, including alternates, consisted entirely of white jurors.

The Court evaluates a *Batson* challenge to the use of a peremptory strike through a three-step analysis: first, the defendant must make a *prima facie* showing of discriminatory motive on the part of the prosecutor; if the defendant does so, then the prosecutor must provide a race-neutral reason for the challenged strike; and finally, if the prosecutor provides a race-neutral reason, the defendant must demonstrate "that the proffered justification was pretextual" or "otherwise establish that the peremptory strike was motivated by a discriminatory purpose." *United States v. Stephens*, 421 F.3d 503, 510 (7th Cir. 2005) (citing *Batson*, 476 U.S. at 98). "To survive a *Batson* challenge, unlike a challenge for cause, a peremptory strike need not be based on a strong or good reason, only founded on a reason other than race or gender." *United States v. Brown*, 34 F.3d 569, 571 (7th Cir. 1994) (emphasis omitted).

As the Court found during jury selection, the Government's use of its peremptory strikes in a manner that had the effect of eliminating the only remaining black jurors in the venire established a *prima facie* case of discriminatory motive. Thus, the burden shifted to the Government to provide race-neutral reasons for its strikes. The first black juror (Juror No. 45) had been shot in the head by a Calumet City police officer and stated that it was the norm for police officers not to be truthful. (Tr. 453–54.) Notably, the Government planned to call several Calumet City police officers as witnesses, and so Protho declined to pursue its challenge to this strike further. The Government stated that the second black potential juror (Juror No. 16) seemed

"too stoic" because she showed little emotional response to the description of a kidnapping and sexual assault of a child even though she was a mother, and she further stated that her employment at a night-shift job might affect her ability to concentrate during trial. (Tr. 454, 471.) The third Black potential juror (Juror No. 16), according to the Government, had trouble hearing and was not following the proceedings. (Tr. 455.)

Because the Government provided race-neutral reasons, the Court proceeded to the third *Batson* inquiry, where Protho had the burden of demonstrating purposeful discrimination by the Government. Regarding the "too stoic" juror, the Court accepted the Government's explanation as race-neutral and did not find any pretext behind the strike. (Tr. 486–87.) Regarding the remaining juror, the Court noted that the Government struck a white juror who was similar in some regards, including his age and his holding an advanced degree. (Tr. 487.) Ultimately, the Court concluded that Protho did not meet his burden.

Renewing his argument post-trial, Protho contends that the Government's proffered race-neutral reasons were plainly pretextual because the Government did not strike similarly situated white jurors who were also stoic and because the Government did not give a good reason for striking the black juror who appeared, in the Government's account, to have trouble hearing and following the proceedings. The Court stands by its prior ruling that Protho failed to establish purposeful discrimination by the Government. The Court critically questioned the Government's asserted reasons at trial and found then, as it finds now, that the Government provided reasonable race-neutral reasons. Moreover, the Court notes that due to its procedure by which the parties submitted their peremptory strikes simultaneously and without knowing the other sides strikes, the Government would not have known that Protho would strike the fourth remaining black juror. And it was only due to a combination of the Government's strikes and the

defense's strike that the jury was devoid of black jurors. Although the Government gave additional reasons for its strikes as the *Batson* hearing occurred and in its post-trial motions, the Court does not find any inconsistencies in the Government's reasoning. Protho has not met his burden of establishing purposeful discrimination as necessary for a *Batson* violation.

### V. New Trial Based on Minor A's Testimony by Closed-Circuit Television

Protho also claims that he is entitled to a new trial based on the Court's decision to allow Minor A to testify via closed-circuit television. On the first day of the trial, the Government called Minor A to the witness stand. She entered the courtroom without the jury present. Almost immediately, she appeared to suffer what can only be described as a breakdown and had to leave the room. Various options were explored to allow Minor A to testify. The Government ultimately filed a motion for her to testify by two-way closed-circuit television pursuant to 18 U.S.C. § 3509 (Dkt. No. 107), which the Court granted (Dkt. No. 111). Protho contends that the federal statute authorizing remote testimony under certain circumstances violates his Sixth Amendment right to confront the witnesses against him and that, in any case, the Court erred in finding that Minor A met the requirements to testify remotely under that statute.

The Crime Control Act of 1990, as amended, provides for special procedures when a child who was the victim of a crime of physical abuse, sexual abuse, or exploitation is called to testify in a criminal case. *See* 18 U.S.C. § 3509. Under the statute, the Government may apply for an order allowing a child victim's testimony to be taken outside the courtroom and televised by two-way closed-circuit television. *Id.* § 3509(b)(1)(A). The Court may allow a child to testify in this manner if it finds that the child is "unable to testify in open court in the presence of the defendant" for any of four specified reasons, including, as relevant here, because "[t]he child is unable to testify because of fear." *Id.* § 3509(b)(1)(B). The Court must support its ruling on the

22

child's inability to testify "with findings on the record." *Id.* § 3509(b)(1)(C). Ordinarily, the Government must apply for an order under § 3509 at least seven days before the trial date. *Id.* § 3509(b)(1)(A). But the Court may also grant such an order if it "finds on the record that the need for such an order was not reasonably foreseeable." *Id.*

Protho contends that his Sixth Amendment rights were violated by the invocation of § 3509 to allow Minor A to testify remotely. The Court disagrees. In *Maryland v. Craig*, the Supreme Court affirmed the constitutionality of a state statute that allowed a victim of child abuse to testify via one-way closed-circuit television. 497 U.S. 836, 855–56 (1990). In that case, the Supreme Court held that the trial court had to make a case-specific finding that the defendant's presence would cause the minor trauma and fear, that testimony by closed-circuit television was necessary to protect the welfare of the child, and that the minor's emotional distress is more than *de minimis*. *See id.* Although *Craig* did not involve § 3509, the state statute at issue there was sufficiently similar to § 3509 that the Court finds its guidance instructive. In finding no constitutional violation, *Craig* specifically addressed the compelling state interest in protecting children from enduring a "face-to-face confrontation" with their alleged abuser in cases involving child abuse. *Id.* at 855. Protho contends that the Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004), undermined its holding in *Craig*. But *Crawford* did not overturn *Craig*, and this Court is not free to depart from established Supreme Court precedent. *See, e.g.*, *United States v. Wandahsega*, 924 F.3d 868, 879 (6th Cir. 2019) (holding that *Crawford* did not overturn *Craig*); *United States v. Carter*, 907 F.3d 1199 (9th Cir. 2018) (same). Protho also contends that *Craig* has been undermined because the Supreme Court decided not to amend Federal Rule of Criminal Procedure 26 to expand the use of two-way

23

video testimony. But this argument has no merit, as the Supreme Court cannot be understood to have overturned precedent merely by choosing not to amend a procedural rule.

Further, the Court made the detailed factual findings required under § 3509 and *Craig* in its February 17, 2020 Order. (Dkt. No. 111.) As explained in that Order, the Court held an evidentiary hearing and heard testimony from Felice Weiler, the United States Attorney's Office's victim witness coordinator, and Christopher Dammons, a senior inspector for the United States Marshals Service. Weiler's testimony indicated that Minor A intended to testify (and appeared ready to do so) but started crying when she came to the door of the courtroom, had difficulty breathing on the stand, and appeared to go into shock. Further, Minor A looked at Protho while she was on the stand. After she left the courtroom, she collapsed on the floor and sobbed, stating that she felt like she was back in the car where she was sexually assaulted. Dammons's testimony corroborated these facts. In sun, based on the evidence presented at the evidentiary hearing and the Court's own observations of Minor A's actions and demeanor when she was in the courtroom with Protho, the Court concluded that the Government could not have foreseen that closed-circuit testimony would be needed, and that Minor A feared testifying in a courtroom with Protho and would suffer emotional trauma from doing so.

Protho contends that the Court should have questioned Minor A directly to confirm whether and why she was afraid of testifying. But the Court had more than enough evidence from which to conclude that the requirements for testimony by closed-circuit television had been met. While Protho complains that the Court's ruling prevented him from confronting and cross-examining Minor A, he was able to (and did) cross-examine Minor A effectively. The Court also implemented procedures allowing Protho to consult instantaneously with his attorney—who was

in the room with Minor A while she testified and during cross-examination—during Minor A's testimony, thereby protecting his right to participate in his own defense.

In short, the Court finds no error, constitutional or otherwise, in its decision to permit Minor A to testify remotely by closed-circuit television.

## VI.    New Trial Based on Improper Comments During Closing Arguments

Protho next contends that he is entitled to a new trial because of certain improper remarks by the Government's attorney during closing arguments.

Specifically, during the Government's rebuttal argument, the Government's attorney stated: "And I'm sorry that a 12—a 12-year-old girl doesn't want to be in the same room as the man who took her off the street and sexually assaulted her. Next time pick an older victim." (Tr. 1974.) Protho objected, and the Court sustained the objection and immediately instructed the jury to disregard the objectionable statement. Notably, both at the beginning of the trial and again shortly before the start of closing arguments, the Court had also instructed the jury that lawyers' statements and arguments are not evidence and should not be relied upon. Given the brevity and lack of specificity of the objectionable statement during closing arguments, the Court determined that any further instruction would only serve to draw unnecessary attention to a matter that otherwise would be unlikely to make an impression on the jury. Nonetheless, Protho moved for a mistrial. The Court denied the motion, finding that the statement, while improper, was not ultimately prejudicial.

In this Circuit, courts engage in a two-step inquiry to evaluate whether prosecutorial misconduct warrants a new trial. "We first determine whether the prosecutor's conduct was improper, and if so, we then evaluate the conduct in light of the entire record to determine if the conduct deprived the defendant of a fair trial." *United States v. Tucker*, 714 F.3d 1006, 1012 (7th

Cir. 2013). "[I]t is not enough that the prosecutor's remarks were undesirable or even universally condemned. The relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks and citations omitted).

Turning to the first step of the inquiry, the Government's statements during closing argument regarding Minor A not wanting to be in the same room as Protho were clearly improper. The jury had heard no evidence that the victim feared testifying in front of Protho. To the contrary, the resolution of the Government's motion under 18 U.S.C. § 3509 was purposely decided outside of the jury's presence with no mention of the reason for the remote testimony provided to the jury. All parties understood that the jury was not to hear that Minor A was testifying from a remote location because she was afraid of Protho. Nonetheless, the Government's attorney suggested precisely that with his remarks. The Government maintains that the comment was merely a response to Protho's closing argument, which emphasized, among other things, the lack of a "live" in-person identification of Protho by the victim. But the Court is not persuaded by this purportedly innocent justification.

Nonetheless, turning to the second step, the Court cannot conclude that in the context of the entire record the Government's inappropriate remarks deprived Protho of a fair trial. The evidence at trial overwhelmingly indicated that Protho committed the crime and his alibi defense was, to put it lightly, less than convincing. Further, the Court's instruction and admonishment allowed the jury to place the brief improper remarks in proper context: a bit of inflammatory rhetoric, not a summation of the evidence in the case. The trial was fair, and Protho suffered no prejudice from the Government's remarks during closing.

### VII.    New Trial Based on the Court's Response to a Jury Note

Protho also seeks a new trial based on what he perceives as the Court's improper response to a jury note received during deliberations.

The evidence admitted in this case included many hours of video surveillance footage. During their deliberations, the jury sent a note to the Court that read: "Can someone ask the U.S. attorney to confirm which video shows the defendant getting out of his car, walking around for a few seconds, then getting back in car, showed him from the waist down? Could be an extract of an original video." (Tr. 2005.) The Government recognized this request as referring to Exhibit Number 13, as the jury's description of the video matched the description of the video at trial. (Tr. 651–52.) Protho's counsel also acknowledged that Exhibit 13 was the only video showing an individual getting out of the car, walking around, and reentering the car, where the video captured the person only below the waist. (Tr. 2018.) While acknowledging that it could not confirm the jury's apparent conclusion that the person portrayed in the video was Protho, the Court found no need to force the jurors to spend dozens of hours shifting through voluminous videos to locate a specific exhibit that they had identified as wanting to review in the jury room. The Court ultimately sent the following response to the jury: "The third file of Government Exhibit 13 shows an individual from the waist down exiting and subsequently reentering a vehicle as described in juror note No. 2." (Tr. 2021.)

Trial courts exercise discretion in administering trials and managing jury deliberations. *See Bollenbach v. United States*, 326 U.S. 607, 612 (1946); *Quercia v. United States*, 289 U.S. 466, 469–70 (1933). However, courts must take special care not to intrude on the jury's fact-finding function. "[I]n a jury trial the primary finders of fact are the jurors. . . . The trial judge is thereby barred from attempting to override or interfere with the jurors' independent judgment in

27

a manner contrary to the interests of the accused." *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 572–73 (1977). "[I]t is the law's objective to guard jealously the sanctity of the jury's right to operate as freely as possible from outside unauthorized intrusions purposefully made." *Remmer v. United States,* 350 U.S. 377, 382 (1956).

In other contexts, appellate courts have found error where the trial court intruded on the jury's fact-finding authority. For example, in *United States v. Miller*, the trial court responded to the jury's questions with information endorsing the jurors' "preliminary, possibly non-unanimous, interpretation of the indictment," and identifying for the jury evidence that, in the Court's opinion, related to certain charges. 738 F.3d 361, 384 (D.C. Cir. 2013). The D.C. Circuit found reversible error because the trial court's response constituted "confirmatory agreement" and even "affirmative advocacy," tainting the deliberative process. *Id.* at 386. Here, however, there was no disputed fact at issue. The jury simply asked for help locating a particular piece of evidence among many hours of video footage. Having confirmed with the parties that only one video exhibit corresponded to the request, the Court identified that exhibit for the jury.

While Protho claims that the Court provided substantive evidence directly to the jury through its response to the jury's request, the Court did no such thing. The parties conceded that the Court's description of the video's contents was accurate and not at issue. Although the Court's response did not further instruct the jurors that it was their responsibility to determine the identity of the person depicted in the video, it also did not endorse the jury's apparent conclusion that the video pictured Protho and instead carefully described the contents of the video without making such an identification. The Court finds no error, no prejudice, and no basis to order a new trial.

## VIII.   New Trial Based on Superseding Indictments and Enhanced Penalty

Protho also challenges the procedures by which the Government charged him and pursued an enhanced penalty for his offense.

Because Protho was convicted pursuant to 18 U.S.C. § 1201(g)(1), he is subject to a mandatory minimum sentence of 20 years' imprisonment. The mandatory minimum applies when the victim is under 18 years old, the perpetrator is 18 years old or older, and the perpetrator is not a parent, grandparent, brother, sister, aunt, uncle, or individual having legal custody of the victim. *Id.* Shortly prior to the originally scheduled trial date, Protho filed a motion *in limine* to prevent the Government from seeking an enhanced sentence based on the fact that none of the required elements under § 1201(g)(1) were charged in the indictment. (Dkt. No. 66.) In response, the Government obtained a Superseding Indictment, which Protho then moved to dismiss on speedy trial and due process grounds. (Dkt. Nos. 67, 72.) The Court denied Protho's motion to dismiss, finding that dismissal would be justified only if the Government had acted vindictively in response to Protho's assertion of his rights and finding no such evidence.

Protho now contends that because the Government did not seek to obtain the Superseding Indictment until Protho filed his motion *in limine*, the Court should infer vindictive retaliation based on the sequence of events. Protho further contends that because he raised "reasonable doubt that the government acted properly," an evidentiary hearing should have been held. *See United States v. Falcon*, 347 F.3d 1000, 1006 (7th Cir. 2003). But Protho did not raise reasonable doubt as to the propriety of the Government's actions. To the contrary, Protho knew from the time the charges were first instituted against him that the Government intended to seek an enhanced penalty. In fact, the original grand jury indictment, returned on January 25, 2018, explicitly alleged that Protho violated 18 U.S.C. § 1201(g)(1)—the 20-year mandatory minimum

clause. That the original indictment failed to allege the elements necessary to obtain that sentencing enhancement was an oversight by the Government—one that it sought to correct by obtaining the Superseding Indictment. Rather than showing that the Government acted vindictively after receiving Protho's motion *in limine*, the timing of the relevant events indicates that the Government acted to correct its unintentional omission of the allegations necessary for the penalty enhancement once that omission was brought to its attention by the motion *in limine*.[6]

## CONCLUSION

For the above reasons, Protho's motions for a new trial and for a judgment of acquittal (Dkt. Nos. 150, 152) are denied.

ENTERED:

Dated:  March 16, 2021

Andrea R. Wood
United States District Judge

---

[6] With his present motions, Protho also has renewed and incorporated his past motions and arguments, which included a prior motion for new trial and motion in arrest of judgment pursuant to Federal Rule of Criminal Procedure 34. (Dkt. Nos. 126, 127.) Those motions are denied for the reasons given in this opinion. Protho's first motion for new trial, in particular, contains only a bulleted list of decisions by this Court that Protho disagrees with and the contention that the Court "erred" in each one; for example, by denying Protho's motion for attorney voir dire and refusing to ask some of Protho's voir dire questions. By failing to develop these arguments, Protho has waived them. *United States v. Foster*, 652 F.3d 776, 792 (7th Cir. 2011) ("As we have said numerous times, undeveloped arguments are deemed waived.") (internal quotation marks omitted). The Court has also reviewed the alleged errors and finds that, to the extent they are not directly addressed in this opinion, they do not rise to the level of prejudice that would warrant a new trial, which, as discussed above, is reserved for "the most extreme cases." *Linwood*, 142 F.3d at 422. Finally, Protho's motion in arrest of judgment contends that the Court lacked jurisdiction over Protho's offense because Congress lacked authority to regulate his actions under the Commerce Clause, a position that the Court has rejected in this opinion.